FILED

OCT 8 0 2008
OCT 30 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 08 CR 888 |
| | ) | |
| v. | ) | Violations: Title 18, United |
| | ) | States Code, Sections 371, 666, |
| | ) | and 1951 |
| WILLIAM F. CELLINI, SR. | ) | JUDGE ZAGEL |
| | ) | |

MAGISTRATE JUDGE COX

## COUNT ONE

### Conspiracy to Commit Mail and Wire Fraud

The SPECIAL FEBRUARY 2008-2 GRAND JURY charges:

1.    At times material to this Indictment:

**Relevant Entities and Individuals**

a.    The Teachers' Retirement System of the State of Illinois ("TRS") was a public pension plan created by Illinois law for the purpose of providing pension, survivor, and disability benefits for teachers and administrators employed in Illinois public schools except in the City of Chicago. It served hundreds of thousands of members and annuitants, and had assets in excess of approximately $30 billion. TRS was funded by annual contributions from teachers, their employers, and the State of Illinois, as well as investment income.

b.    The activities of TRS were directed by an 11-member Board of Trustees. Certain of those trustees were appointed by statute by the Governor of the State of Illinois, while other trustees were elected by teachers and annuitants. Among its other responsibilities, the Board of Trustees reviewed and voted to approve or reject proposals by private investment management companies to manage funds on behalf of TRS. At any given time, TRS assets were managed by numerous different investment management companies. These companies were compensated by

TRS for their activities, typically through fees calculated as a percentage of the TRS assets they managed.

c.     In carrying out all of their duties, including reviewing and deciding whether to approve or reject proposals by private investment management firms to manage TRS assets, members of the TRS Board of Trustees owed a fiduciary duty to the beneficiaries of TRS and were required to act solely for the benefit of the beneficiaries of TRS.

d.     It was the ordinary course of business for TRS to use the U.S. mails, private and commercial interstate carriers and wirings in interstate commerce in the course of making investments.

e.     Defendant WILLIAM F. CELLINI, SR. ("CELLINI") had longstanding relationships and influence with TRS trustees, including Stuart Levine, and TRS staff members, and was associated with a real estate asset management firm, Commonwealth Realty Advisors, that managed hundreds of millions of dollars on behalf of TRS. CELLINI also raised significant funds for, among others, Public Official A.

f.     Stuart Levine was a member of the TRS Board of Trustees and a long-time associate of CELLINI. CELLINI and Levine discussed matters involving TRS, including matters that affected Commonwealth Realty Advisors, and Levine agreed to assist CELLINI with various matters involving TRS.

g.     Antoin "Tony" Rezko was a businessman and an associate of CELLINI, and Levine. Rezko raised significant amounts of money for, among others, Public Official A. Rezko had significant influence with Public Official A, including influence concerning the appointment of individuals to Illinois state boards and commissions, such as TRS.

2

h.      Co-Conspirator A was a businessman and associate of CELLINI, Levine, and Rezko. Co-Conspirator A raised significant amounts of money for, among others, Public Official A, and had significant influence with Public Official A.

i.      TRS Staffer A was the Executive Director of TRS. In that position, TRS Staffer A had significant influence over the investments made by TRS. TRS Staffer A was a long-time associate of CELLINI, and CELLINI and TRS Staffer A discussed matters involving TRS, including matters that affected Commonwealth Realty Advisors.

j.      Steven Loren was a lawyer. He and his law firm were outside counsel for TRS.

k.      Capri Capital was a real estate asset manager based in Chicago, Illinois, which invested funds on behalf of TRS in various real estate projects located throughout the United States. Thomas Rosenberg was a principal and part owner of Capri Capital.

l.      On or about February 20, 2004, the TRS Board approved allocations of TRS funds to four real estate management firms, including allocations totaling $220 million to Commonwealth Realty Advisors. Prior to the February 2004 TRS Board meeting, TRS staff had planned to recommend that Capri Capital receive allocations totaling $220 million at the February 2004 TRS Board meeting. Prior to the February 2004 TRS Board meeting, Levine used his influence and position at TRS to change the TRS staff recommendation with respect to the $220 million allocation to Capri Capital. The TRS Board did not approve any allocation of TRS funds to Capri Capital at the February 2004 TRS Board meeting.

3

## Illinois Laws Regarding Conduct of Public Officials and Bribery

m.      Pursuant to the criminal laws of the State of Illinois, relating to bribery (720 ILCS 5/33-1(d)), Levine, as a member of the TRS Board, was prohibited from agreeing to accept any property or personal advantage which he was not authorized by law to accept, knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to his employment or function as a public officer.

n.      Pursuant to the criminal laws of the State of Illinois, relating to official misconduct (720 ILCS 5/33-3), Levine, as a member of the TRS Board, was prohibited from doing the following in his official capacity: (1) performing any act in excess of his lawful authority, with intent to obtain a personal advantage for himself or others; and (2) soliciting or knowingly accepting, for the performance of any act, a fee or reward which he knew was not authorized by law.

o.      Pursuant to the laws of the State of Illinois relating to pensions (40 ILCS 5/1-109), Levine, as a member of the TRS Board, was required to discharge his duties solely in the interest of TRS participants and beneficiaries and for the exclusive purpose of (a) providing benefits to TRS participants and their beneficiaries, and (b) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person would use.

p.      Pursuant to the laws of the State of Illinois relating to pensions (40 ILCS 5/1-110), Levine, as a member of the TRS Board, was prohibited from (a) dealing with the assets of TRS in his own interest or for his own account, and (b) receiving any consideration for his own personal account from any party dealing with TRS in connection with a transaction involving the assets of TRS.

4

q.      Pursuant to the State Officials and Employees Ethics Act (5 ILCS 430/5-50),

effective December 9, 2003, Levine, as a member of the TRS Board, was prohibited from having any

material communications with a representative of a party concerning a pending matter, or *ex*

*parte* contacts, without reporting that contact to the TRS Board in writing.

## The Conspiracy To Defraud

2.      Beginning no later than in and about the spring of 2003 and continuing through in or

about the summer of 2005, in the Northern District of Illinois, Eastern Division, and elsewhere,

### WILLIAM F. CELLINI, SR.,

defendant herein, together with Stuart Levine, Antoin "Tony" Rezko, Steven Loren, Co-Conspirator

A, and others known and unknown to the Grand Jury, did conspire and agree with each other to

commit offenses against the United States, namely, to devise and participate in a scheme to defraud

the beneficiaries of TRS and the people of the State of Illinois of their intangible right to Levine's

honest services, and it was foreseeable that for the purposes of executing and attempting to execute

such scheme, one or more members of the conspiracy would use and cause the use of the United

States mails and private and commercial interstate carriers, and the transmission of a wire

communication in interstate commerce, in violation of Title 18, United States Code, Sections 1341,

1343, and 1346.

## Overview

3.      It was part of the conspiracy that CELLINI, Levine, Rezko, and Co-Conspirator A

agreed to and did use their influence at TRS and Levine's position at TRS to arrange for TRS to

invest with and hire firms that made contributions for the benefit of Public Official A. As CELLINI,

Rezko, and Co-Conspirator A knew, Levine agreed to use his influence and position at TRS to help

5

the firms that had made contributions for the benefit of Public Official A even though Levine understood that those firms were being chosen based on their political contributions.

4.     It was further part of the conspiracy that CELLINI, Levine, Rezko, and Co-Conspirator A agreed that they would use their influence and Levine's position at TRS to prevent Rosenberg's firm, Capri Capital, from receiving a planned $220 million allocation of TRS funds unless Rosenberg and Capri Capital agreed to raise or donate a substantial amount of funds for the benefit of Public Official A. When Rosenberg threatened to expose the plan, CELLINI, Levine, Rezko, and Co-Conspirator A acted together to prevent Rosenberg from telling law enforcement about the extortion plan. As a result of Rosenberg's threat, CELLINI, Levine, Rezko, and Co-Conspirator A agreed that Capri Capital would receive the $220 million allocation, but that Capri Capital and Rosenberg would receive no further funds from the State of Illinois.

5.     It was further part of the conspiracy that CELLINI, Rezko, and Co-Conspirator A agreed to and did engage in *ex parte* communications with Levine, other TRS trustees, and TRS staff members, including TRS Staffer A, concerning official actions and related matters pending before TRS. As CELLINI was aware, Levine concealed from and failed to disclose to the TRS Board the existence and nature of these *ex parte* communications.

6.     It was further part of the conspiracy that, as CELLINI knew, Levine concealed from and failed to disclose to the TRS Board material facts concerning the benefits that Levine sought to obtain for and on behalf of CELLINI, Levine, Rezko, Co-Conspirator A, Public Official A, and others from official actions taken by TRS.

## Maintaining Control Over TRS

7.     It was further part of the conspiracy that in or about the spring of 2003, CELLINI and

6

Levine discussed a plan by certain State of Illinois officials to consolidate TRS with two other State of Illinois pension funds. CELLINI and Levine agreed to oppose the pension consolidation plan because they feared that such a change would threaten the control and influence that CELLINI and Levine had at TRS, as well as the profits received by Commonwealth Realty Advisors as a real estate asset manager for TRS. CELLINI and Levine further decided that CELLINI would approach Rezko and Co-Conspirator A to seek the help of Rezko and Co-Conspirator A in defeating the pension consolidation plan. CELLINI and Levine agreed that CELLINI would propose to Rezko and Co-Conspirator A that in exchange for the support of Rezko and Co-Conspirator A in defeating the pension consolidation plan, CELLINI would agree that CELLINI would use his influence at TRS and Levine would use his position at TRS to ensure that TRS invested money with and hired firms, such as investment funds, asset managers, and law firms, chosen by Rezko and Co-Conspirator A.

8.     It was further part of the conspiracy that CELLINI later told Levine that Rezko and Co-Conspirator A had agreed to the proposal to use their influence with high-ranking State of Illinois officials to oppose the pension consolidation plan in exchange for CELLINI's agreement to use his influence at TRS and Levine's position at TRS to ensure that TRS invested money with and hired firms chosen by Rezko and Co-Conspirator A. CELLINI and Levine understood that Rezko and Co-Conspirator A were going to expect under the agreement that CELLINI would use his influence at TRS and Levine would use his position at TRS to help firms that made contributions for the benefit of Public Official A.

9.     It was further part of the conspiracy that CELLINI asked Levine to provide talking points that Rezko and Co-Conspirator A could use to argue against the pension consolidation plan. Levine arranged with Loren to send talking points to CELLINI so that CELLINI could provide the

7

talking points to Rezko and Co-Conspirator A.

10.     It was further part of the conspiracy that beginning in about the spring of 2003, Rezko and Co-Conspirator A at times gave Levine the names of firms that Rezko and Co-Conspirator A wanted TRS to invest with or to hire. Levine understood that the firms that Rezko and Co-Conspirator A sought to help had made or would make contributions of money for the benefit of Public Official A. Levine did try to use his position and influence at TRS to assist the firms chosen by Rezko and Co-Conspirator A, although there were times that Rezko and Co-Conspirator A sought to help firms that could not receive investments from TRS for various reasons.

11.     It was further part of the conspiracy that CELLINI and Levine asked Rezko and Co-Conspirator A to use their influence with the State of Illinois administration to ensure that Levine was re-appointed to the TRS Board prior to the expiration of Levine's term as a trustee. Rezko and Co-Conspirator A agreed to and did use their influence to ensure that Levine was re-appointed to the TRS Board in about May 2004.

### Extortion of Thomas Rosenberg and Capri Capital

12.     It was further part of the conspiracy that in about April 2004, Levine told Rezko that they could force Rosenberg and Capri Capital to pay to obtain a potential $220 million allocation of TRS funds. Levine and Rezko agreed that they would use their influence and Levine's position at TRS to prevent Capri Capital from receiving its $220 million allocation unless Capri Capital or one of its principals, Rosenberg, agreed to make a payment as Levine and Rezko directed. Levine, Rezko, and Co-Conspirator A further agreed if Rosenberg and Capri Capital arranged to raise and donate a significant amount of money in contributions for the benefit of Public Official A, Levine, Rezko, and Co-Conspirator A would permit Capri Capital to receive the $220 million allocation

8

from TRS. Levine, Rezko, and Co-Conspirator A further agreed that Levine would arrange for CELLINI to communicate to Rosenberg that Capri Capital was not going to receive its $220 million allocation because of Rosenberg's failure to make a significant political contribution for the benefit of Public Official A.

13.    It was further part of the conspiracy that in or about early May 2004, Levine informed CELLINI about the plan to require Rosenberg and Capri Capital to raise or donate money for the benefit of Public Official A in order for Capri Capital to receive its $220 million allocation from TRS. CELLINI agreed to tell Rosenberg that Capri Capital was not going to receive its $220 million allocation because Rosenberg had not made a significant contribution for the benefit of Public Official A. CELLINI and Levine agreed that once Rosenberg understood that the reason Capri Capital was not going to receive its $220 million allocation was because of Rosenberg's failure to make a significant contribution for the benefit of Public Official A, CELLINI would direct Rosenberg to talk with Levine so that Levine could arrange with Rosenberg how Rosenberg and Capri Capital could make the necessary contributions for the benefit of Public Official A to ensure that Capri Capital would receive its $220 million allocation.

14.    It was further part of the conspiracy that on or about May 6, 2004, Levine told TRS Staffer A that CELLINI was going to tell Rosenberg that Rezko was shocked that Rosenberg wanted to receive the $220 million allocation from TRS without having made any political contributions for the benefit of Public Official A and that Rosenberg was going to have to deal with Rezko.

15.    It was further part of the conspiracy that on or about May 7, 2004, CELLINI told Rosenberg that there had been a meeting involving Rezko and Co-Conspirator A concerning plans for raising political donations for the benefit of Public Official A from pension fund managers, and

9

that during this meeting Rezko had observed that Capri Capital had a lot of TRS funds under management but had not made any political donations for the benefit of Public Official A. CELLINI told Rosenberg words to the effect that Capri Capital had not gotten its $220 million allocation from TRS because of its failure to make political donations for the benefit of Public Official A.

16.     It was further part of the conspiracy that on or about May 7, 2004, after CELLINI told Rosenberg about the reasons that Capri Capital had not received its $220 million allocation, CELLINI called Levine.  In that call, CELLINI told Levine about Rosenberg's reaction when CELLINI had explained to Rosenberg that Capri Capital would not receive the $220 million allocation because Rosenberg had failed to make a political donation for the benefit of Public Official A.

17.     It was further part of the conspiracy that on or about May 8, 2004, CELLINI called Levine and reported on another conversation CELLINI had with Rosenberg earlier that day in which Rosenberg advised CELLINI that Rosenberg would not be extorted. CELLINI further told Levine that Rosenberg had threatened to inform law enforcement about the extortion. CELLINI and Levine discussed ways in which they could deal with Rosenberg's threat to inform law enforcement about the extortion, such as by giving Capri Capital a small allocation of money from TRS, which would make it more difficult for Rosenberg to claim that the firm was being extorted. CELLINI and LEVINE agreed to discuss the matter with Rezko.

18.     It was further part of the conspiracy that on or about May 10, 2004, CELLINI informed Co-Conspirator A about Rosenberg's threat to expose the extortion plan.

19.     It was further part of the conspiracy that on or about May 10, 2004, CELLINI told Levine about CELLINI's prior conversation with Co-Conspirator A about Rosenberg's threat to

10

expose the extortion plan. In that conversation, CELLINI and Levine further discussed ways in which they could discourage Rosenberg from going to law enforcement to expose the extortion plan. CELLINI told Levine that CELLINI had spoken with TRS Staffer A earlier, and that TRS Staffer A had agreed with CELLINI that Capri Capital could be given $20 million in TRS funds on a different investment instead of the $220 million allocation, which would make it more difficult for Rosenberg to claim that Rosenberg was being extorted. CELLINI and Levine further agreed that no final decision as to what was to be done with respect to Rosenberg should be made until Rezko was available to discuss the matter.

20.    It was further part of the conspiracy that on or about May 11, 2004, CELLINI, Levine, Rezko, and Co-Conspirator A agreed that in light of Rosenberg's threat to inform law enforcement about the extortion, it was too risky to continue demanding money from Rosenberg and Capri Capital or blocking the $220 million allocation to Capri Capital.

21.    It was further part of the conspiracy that CELLINI, Levine, Rezko, and Co-Conspirator A agreed that although Capri Capital would receive the $220 million allocation, it would not receive any further business from any State of Illinois entity, including TRS.

22.    It was further part of the conspiracy that after the discussion involving CELLINI, Levine, Rezko, and Co-Conspirator A on or about May 11, 2004, CELLINI spoke with Rosenberg on several occasions for the purpose of discouraging him from disclosing the extortion attempt, falsely advising Rosenberg that Rezko, Levine, and Co-Conspirator A had nothing to do with Capri Capital's failure to receive its $220 million allocation, and representing that CELLINI and Levine had used their influence with TRS staff to ensure that Capri Capital would receive its allocation.

23.    It was further part of the conspiracy that after the meeting on or about May 11, 2004,

CELLINI and Levine used their influence and Levine's position at TRS to ensure that Capri Capital received its $220 million allocation at the next TRS Board meeting so that the extortion plan against Rosenberg and Capri Capital was not revealed. On or about May 25, 2004, the TRS Board, including Levine, voted to allocate a total of $220 million to Capri Capital.

## Concealment

24.    It was further part of the conspiracy that CELLINI, Levine, Rezko, Co-Conspirator A, and their co-conspirators, did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts.

25.    It was further part of the conspiracy that in or around the summer of 2004, CELLINI, Rezko, Co-Conspirator A, and others discussed moving TRS Staffer A from his position at TRS into another job with a different state entity in an effort to ensure that TRS Staffer A would not cooperate with the government.

26.    It was further part of the conspiracy that in or around the summer and fall of 2004, in an effort to conceal the conspiracy, CELLINI, Rezko and others discussed the possibility of removing the U.S. Attorney for the Northern District of Illinois in an effort to stop any investigation into the co-conspirators and others.

## OVERT ACTS

27.    In furtherance of and to accomplish the objectives of the conspiracy, one or more of the following acts were committed:

a.    In or about the spring of 2003, CELLINI acquired talking points of arguments opposing the pension consolidation plan to give to Rezko and Co-Conspirator A.

b.    On or about May 7, 2004, CELLINI had a telephone conversation with

Rosenberg where CELLINI told Rosenberg words to the effect that Capri Capital had not gotten its $220 million allocation from TRS because of its failure to make political donations for the benefit of Public Official A.

   c.  On or about May 8, 2004, CELLINI had a telephone conversation with Rosenberg where CELLINI tried to discourage Rosenberg from reporting the extortion attempt to law enforcement.

   d.  Shortly prior to May 10, 2004, CELLINI talked with TRS Staffer A about the possibility that Capri Capital could receive a smaller investment from TRS so that Rosenberg could not complain about being extorted.

   e.  Within days of May 11, 2004, CELLINI had a telephone conversation with Rosenberg where CELLINI falsely advised Rosenberg that Rezko and Co-Conspirator A had nothing to do with Capri Capital's failure to receive its $220 million allocation.

   f.  Within days of May 11, 2004, CELLINI had a telephone conversation with Rosenberg where CELLINI falsely told Rosenberg that Levine had nothing to do with Capri Capital's failure to receive its $220 million allocation.

   g.  On or about May 25, 2004, Levine voted in favor of TRS allocating $220 million to Capri Capital;

  All in violation of Title 18, United States Code, Section 371.

13

## COUNT TWO

### Conspiracy To Commit Extortion

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.      Beginning in or about April 2004 and continuing through at least in or about the summer of 2005, in the Northern District of Illinois, Eastern Division, and elsewhere,

### WILLIAM F. CELLINI, SR.,

defendant herein, did conspire with Stuart Levine, Antoin "Tony" Rezko, Co-Conspirator A, and others, to commit extortion, which extortion would obstruct, delay, and affect commerce as "extortion" and "commerce" are defined in Title 18, United States Code, Section 1951, in that they attempted to obtain property, in the form of political contributions for the benefit of Public Official A arranged by and from Thomas Rosenberg and Capri Capital, with Rosenberg's and Capri Capital's consent induced under the color of official right, and by the wrongful use of actual and threatened fear of economic harm.

### Overview of the Conspiracy

3.      As part of the conspiracy, CELLINI, Levine, Rezko, and Co-Conspirator A agreed that they would use their influence and Levine's position at TRS to prevent Rosenberg's firm, Capri Capital, from receiving a planned $220 million allocation of TRS funds unless Rosenberg and Capri Capital agreed to raise or donate a substantial amount of funds for the benefit of Public Official A. When Rosenberg threatened to expose the plan, CELLINI, Levine, Rezko, and Co-Conspirator A acted together to prevent Rosenberg from telling law enforcement about the extortion plan. As a

result of Rosenberg's threat, CELLINI, Levine, Rezko, and Co-Conspirator A agreed that Capri Capital would receive the $220 million allocation, but that Capri Capital and Rosenberg would receive no further funds from the State of Illinois.

### Thomas Rosenberg and Capri Capital

4.      It was further part of the conspiracy that in about April 2004, Levine told Rezko that they could force Rosenberg and Capri Capital to pay to obtain a potential $220 million allocation of TRS funds.  Levine and Rezko agreed that they would use their influence and Levine's position at TRS to prevent Capri Capital from receiving its $220 million allocation unless Capri Capital or one of its principals, Rosenberg, agreed to make a payment as Levine and Rezko directed.  Levine, Rezko, and Co-Conspirator A further agreed if Rosenberg and Capri Capital arranged to raise and donate a significant amount of money in contributions for the benefit of Public Official A, Levine, Rezko, and Co-Conspirator A would permit Capri Capital to receive the $220 million allocation from TRS.  Levine, Rezko, and Co-Conspirator A further agreed that Levine would arrange for CELLINI to communicate to Rosenberg that Capri Capital was not going to receive its $220 million allocation because of Rosenberg's failure to make a significant political contribution for the benefit of Public Official A.

5.      It was further part of the conspiracy that in or about early May 2004, Levine informed CELLINI about the plan to require Rosenberg and Capri Capital to raise or donate money for the benefit of Public Official A in order for Capri Capital to receive its $220 million allocation from TRS. CELLINI agreed to tell Rosenberg that Capri Capital was not going to receive its $220 million allocation because Rosenberg had not made a significant contribution for the benefit of Public Official A.  CELLINI and Levine agreed that once Rosenberg understood that the reason Capri

15

Capital was not going to receive its $220 million allocation was because of Rosenberg's failure to make a significant contribution for the benefit of Public Official A, CELLINI would direct Rosenberg to talk with Levine so that Levine could arrange with Rosenberg how Rosenberg and Capri Capital could make the necessary contributions for the benefit of Public Official A to ensure that Capri Capital would receive its $220 million allocation.

6.      It was further part of the conspiracy that on or about May 6, 2004, Levine told TRS Staffer A that CELLINI was going to tell Rosenberg that Rezko was shocked that Rosenberg wanted to receive the $220 million allocation from TRS without having made any political contributions for the benefit of Public Official A and that Rosenberg was going to have to deal with Rezko.

7.      It was further part of the conspiracy that on or about May 7, 2004, CELLINI told Rosenberg that there had been a meeting involving Rezko and Co-Conspirator A concerning plans for raising political donations for the benefit of Public Official A from pension fund managers, and that during this meeting Rezko had observed that Capri Capital had a lot of TRS funds under management but had not made any political donations for the benefit of Public Official A. CELLINI told Rosenberg words to the effect that Capri Capital had not gotten its $220 million allocation from TRS because of its failure to make political donations for the benefit of Public Official A.

8.      It was further part of the conspiracy that on or about May 7, 2004, after CELLINI told Rosenberg about the reasons that Capri Capital had not received its $220 million allocation, CELLINI called Levine. In that call, CELLINI told Levine about Rosenberg's reaction when CELLINI had explained to Rosenberg that Capri Capital would not receive the $220 million allocation because Rosenberg had failed to make a political donation for the benefit of Public Official A.

9.      It was further part of the conspiracy that on or about May 8, 2004, CELLINI called Levine and reported on another conversation CELLINI had with Rosenberg earlier that day in which Rosenberg advised CELLINI that Rosenberg would not be extorted. CELLINI further told Levine that Rosenberg had threatened to inform law enforcement about the extortion. CELLINI and Levine discussed ways in which they could deal with Rosenberg's threat to inform law enforcement about the extortion, such as by giving Capri Capital a small allocation of money from TRS, which would make it more difficult for Rosenberg to claim that the firm was being extorted. CELLINI and LEVINE agreed to discuss the matter with Rezko.

10.      It was further part of the conspiracy that on or about May 10, 2004, CELLINI informed Co-Conspirator A about Rosenberg's threat to expose the extortion plan.

11.      It was further part of the conspiracy that on or about May 10, 2004, CELLINI told Levine about CELLINI's prior conversation with Co-Conspirator A about Rosenberg's threat to expose the extortion plan. In that conversation, CELLINI and Levine further discussed ways in which they could discourage Rosenberg from going to law enforcement to expose the extortion plan. CELLINI told Levine that CELLINI had spoken with TRS Staffer A earlier, and that TRS Staffer A had agreed with CELLINI that Capri Capital could be given $20 million in TRS funds on a different investment instead of the $220 million allocation, which would make it more difficult for Rosenberg to claim that Rosenberg was being extorted. CELLINI and Levine further agreed that no final decision as to what was to be done with respect to Rosenberg should be made until Rezko was available to discuss the matter.

12.      It was further part of the conspiracy that on or about May 11, 2004, CELLINI, Levine, Rezko, and Co-Conspirator A agreed that in light of Rosenberg's threat to inform law enforcement

about the extortion, it was too risky to continue demanding money from Rosenberg and Capri Capital or blocking the $220 million allocation to Capri Capital.

13.     It was further part of the conspiracy that CELLINI, Levine, Rezko, and Co-Conspirator A agreed that although Capri Capital would receive the $220 million allocation, it would not receive any further business from any State of Illinois entity, including TRS.

14.     It was further part of the conspiracy that after the discussion involving CELLINI, Levine, Rezko, and Co-Conspirator A on or about May 11, 2004, CELLINI spoke with Rosenberg on several occasions for the purpose of discouraging him from disclosing the extortion attempt, falsely advising Rosenberg that Rezko, Levine, and Co-Conspirator A had nothing to do with Capri Capital's failure to receive its $220 million allocation, and representing that CELLINI and Levine had used their influence with TRS staff to ensure that Capri Capital would receive its allocation.

15.     It was further part of the conspiracy that after the meeting on or about May 11, 2004, CELLINI and Levine used their influence and Levine's position at TRS to ensure that Capri Capital received its $220 million allocation at the next TRS Board meeting so that the extortion plan against Rosenberg and Capri Capital was not revealed. On or about May 25, 2004, the TRS Board, including Levine, voted to allocate a total of $220 million to Capri Capital.

## Concealment

16.     It was further part of the conspiracy that CELLINI, Levine, Rezko, Co-Conspirator A, and their co-conspirators, did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts.

17.     It was further part of the conspiracy that in or around the summer of 2004, CELLINI, Rezko, Co-Conspirator A, and others discussed moving TRS Staffer A from his position at TRS into

18

another job with a different state entity in an effort to ensure that TRS Staffer A would not cooperate with the government.

18.   It was further part of the conspiracy that in or around the summer and fall of 2004, in an effort to conceal the conspiracy, CELLINI, Rezko and others discussed the possibility of removing the U.S. Attorney for the Northern District of Illinois in an effort to stop any investigation into the co-conspirators and others;

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT THREE

### Attempted Extortion of Thomas Rosenberg and Capri Capital

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.     Beginning in or about April 2004 and continuing through at least in or about the summer of 2005, in the Northern District of Illinois, Eastern Division, and elsewhere,

WILLIAM F. CELLINI, SR.,

defendant herein, Stuart Levine, Antoin "Tony" Rezko, Co-Conspirator A, and others, did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of Public Official A arranged by and from Thomas Rosenberg and Capri Capital, with Rosenberg's and Capri Capital's consent induced under the color of official right, and by the wrongful use of actual and threatened fear of economic harm;

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT FOUR

### Solicitation of Funds from Thomas Rosenberg and Capri Capital

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.    From in or about April 2004 through in or about May 2004, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, Stuart Levine, being an agent of TRS, an organization which during a one-year period, including this time frame, received federal benefits in excess of $10,000, did corruptly solicit, demand, and agree to accept a thing of value, namely, contributions for the benefit of Public Official A raised by and from Thomas Rosenberg and Capri Capital, and Levine intended to be influenced and rewarded in connection with the business, a transaction, and a series of transactions of TRS involving a thing of value of $5,000 or more, namely, the placement of TRS funds, and

WILLIAM F. CELLINI, SR.,

defendant herein, along with Antoin "Tony" Rezko, Co-Conspirator A, and others, did aid and abet Levine in committing said offense;

In violation of Title 18, United States Code, Sections 666 (a)(1)(B) and 2.

A TRUE BILL:

_____

FOREPERSON

_____

UNITED STATES ATTORNEY

21