RECEIVED

APR 0 2 2009

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 888 |
| v. | ) | Violations: Title 18, Sections |
| | ) | 1001(a)(2), 1343, 1346, 1349, 1951(a), |
| ROD BLAGOJEVICH, | ) | and 1962(d) |
| CHRISTOPHER KELLY, | ) | |
| ALONZO MONK, | ) | Judge James B. Zagel |
| WILLIAM F. CELLINI, SR., | ) | |
| JOHN HARRIS, and | ) | **Superseding Indictment** JUDGE ZAGEL |
| ROBERT BLAGOJEVICH | ) | |

**COUNT ONE**          MAGISTRATE JUDGE COX

The SPECIAL FEBRUARY 2008-2 GRAND JURY charges: FILED
                                                    4-0-09
1.    At times material to this Superseding Indictment:      APR 0 2 2009

**Relevant Entities and Individuals**          MICHAEL W. DOBBINS
                                               CLERK, U.S. DISTRICT COURT

a.    Defendant ROD BLAGOJEVICH was the Governor of the

State of Illinois. He was elected Governor in 2002 and was reelected Governor

in 2006. BLAGOJEVICH previously served as a Member of the United States

House of Representatives from the Fifth Congressional District in Illinois.

b.    Friends of Blagojevich was established in or about June 2000

and was a private entity existing under the laws of Illinois as a campaign

committee for the purpose of supporting the election of ROD BLAGOJEVICH as

Governor of Illinois, and was the principal campaign fundraising vehicle for

ROD BLAGOJEVICH. Friends of Blagojevich maintained offices at 4147 North

Ravenswood, Chicago, Illinois. Although various individuals, including, at times, defendant CHRISTOPHER KELLY, Alonzo Monk, and Robert Blagojevich, held the office of chairman of Friends of Blagojevich, at all times the activities and financial affairs of Friends of Blagojevich were controlled and directed by ROD BLAGOJEVICH, for whose benefit Friends of Blagojevich was operated.

   c. Defendant CHRISTOPHER KELLY was a Chicago-area businessman and a principal campaign fundraiser for defendant ROD BLAGOJEVICH. KELLY served as Chairman of Friends of Blagojevich from in or about early 2004 until in or about August 2005. With the knowledge and permission of ROD BLAGOJEVICH, KELLY at times exercised substantial influence over certain activities of the Office of the Governor.

   d. Antoin Rezko was a Chicago-area businessman and a principal campaign fundraiser for defendant ROD BLAGOJEVICH. With the knowledge and permission of ROD BLAGOJEVICH, Rezko at times exercised substantial influence over certain activities of the Office of the Governor.

   e. Alonzo Monk was a long-time associate of defendant ROD BLAGOJEVICH, and among other things served as his general counsel while a Member of Congress, as campaign manager for his 2002 and 2006 gubernatorial campaigns, on his transition team after his election in November 2002, and as

his Chief of Staff from in or about January 2003 until in or about December 2005. Beginning in or about early 2007, Monk worked as a lobbyist, doing business as AM3 Consulting, Ltd. As a lobbyist, Monk principally represented businesses with interests involving Illinois state government, including businesses in the horse racing industry. In addition, Monk served as Chairman of Friends of Blagojevich from in or about December 2006 to in or about July 2007.

f.     Robert Blagojevich is the brother of defendant ROD BLAGOJEVICH. Beginning in or about August 2008, Robert Blagojevich served as the chairman of Friends of Blagojevich.

g.     Beginning in or about late 2005, John Harris was employed by the State of Illinois as the Chief of Staff to the Governor, defendant ROD BLAGOJEVICH.

h.     Stuart Levine was a member of the Illinois Health Facilities Planning Board and the Board of Trustees of the Teachers' Retirement System.

i.     The Illinois Health Facilities Planning Board ("Planning Board") was a commission of the State of Illinois, established by statute, whose members were appointed by the Governor of the State of Illinois. State law required an entity seeking to build a hospital, medical office building, or other

medical facility in Illinois to obtain a permit, known as a "Certificate of Need," from the Planning Board prior to beginning construction.

        ii.    The Teachers' Retirement System of the State of Illinois ("TRS") was a public pension plan created by Illinois law for the purpose of providing pension, survivor, and disability benefits for teachers and administrators employed in Illinois public schools except in the City of Chicago. It served approximately 325,000 members and annuitants, and had assets in excess of approximately $30 billion. TRS was funded by annual contributions from teachers, their employers, and the State of Illinois, as well as investment income. The activities of TRS were directed by a Board of Trustees. Certain of the trustees, among them Stuart Levine, were appointed by the Governor, while other trustees were elected by teachers and annuitants. Among its other responsibilities, the Board of Trustees reviewed and voted to approve or reject proposals by private investment management companies to manage funds on behalf of TRS.

        i.    William F. Cellini, Sr., was a Springfield, Illinois, businessman and had longstanding relationships and influence with TRS trustees, including Stuart Levine, as well as TRS staff members. Cellini was associated with a real estate asset management firm, Commonwealth Realty Advisors, that invested hundreds of millions of dollars on behalf of TRS. Cellini also raised significant

4

campaign funds for defendant ROD BLAGOJEVICH, in part through Cellini's role as the executive director of the Illinois Asphalt Pavement Association, an industry organization.

j.     Capri Capital was a real estate asset management company based in Chicago, Illinois, that invested funds on behalf of TRS.  Thomas Rosenberg was a principal and part owner of Capri Capital.

### Duties and Powers of the Office of Governor

k.     The Office of the Governor of the State of Illinois ("Governor's Office") was entrusted with extensive duties including, among other things, supporting, approving and vetoing legislation; appointing directors and key administrators of state departments, agencies, and boards; issuing executive orders; authorizing expenditures of certain grant funds; annually proposing a budget and overseeing the expenditure of state funds; and otherwise setting priorities and direction for the State of Illinois.  As chief executive of the State of Illinois, the Governor was responsible for administration of all areas of the executive branch of state government not under the authority of the other constitutionally-elected officials.  The Office of the Governor employed staff members to assist the Governor in performing his duties.

l.     Shortly after his election on November 4, 2008, as President of the United States, Barack Obama resigned his position as United States

Senator from Illinois, creating a vacancy in that office. As Governor of Illinois, defendant ROD BLAGOJEVICH had the duty under Illinois law, 10 ILCS 5/25-8, to appoint a replacement, who would serve the approximately two years remaining in Barack Obama's term as United States Senator.

## Illinois Laws Regarding the Conduct of Government Officials

m.     Defendant ROD BLAGOJEVICH, Monk, and Harris, while serving as officers and employees of the State of Illinois, and Levine, while serving as a Trustee of TRS and a member of the Planning Board, were bound by the following laws, duties, policies and procedures:

i.     As Governor, defendant ROD BLAGOJEVICH was a constitutional officer and as such, at the outset of each term, was required to take an oath of office to support the Constitution of the United States and the Constitution of the State of Illinois, and to faithfully discharge the duties of the office of Governor to the best of his ability.

ii.     Pursuant to Article VIII, Section 1(a) of the Constitution of the State of Illinois, public funds, property and credit shall be used only for public purposes.

iii.     As officers and employees of the State of Illinois, defendant ROD BLAGOJEVICH, Monk, and Harris owed a duty of honest

6

services to the people of the State of Illinois in the performance of their public duties.

iv.     As a Trustee of TRS, Levine owed a fiduciary duty and a duty of honest services to the beneficiaries of TRS and was required to act solely for their benefit. As a member of the Health Facilities Planning Board, Levine owed a duty of honest services to the people of the State of Illinois in the performance of his duties on the Health Facilities Planning Board.

v.     Pursuant to the criminal laws of the State of Illinois (720 ILCS 5/33-3(c) and (d)), defendant ROD BLAGOJEVICH, Monk, Levine, and Harris each was prohibited from committing the following acts in his official capacity: (1) performing an act in excess of his lawful authority, with intent to obtain a personal advantage for himself or others; and (2) soliciting or knowingly accepting, for the performance of any act, a fee or reward which he knows is not authorized by law.

vi.     Pursuant to the criminal laws of the State of Illinois (720 ILCS 5/33-1(d)), defendant ROD BLAGOJEVICH, Monk, and Levine each was prohibited from receiving, retaining, or agreeing to accept any property or personal advantage which he was not authorized by law to accept, knowing that such property or personal advantage was promised or tendered with intent to

cause him to influence the performance of any act related to the employment or function of his public office.

vii.    Pursuant to the criminal laws of the State of Illinois (50 ILCS 105/3), defendant ROD BLAGOJEVICH, Monk, and Levine each was prohibited from being, in any manner, financially interested, either directly or indirectly, in any contract or the performance of any work in regard to which he may have been called upon to act.

n.    In or about September 2008, the Illinois General Assembly enacted Public Act 95-971, effective January 1, 2009, that, among other things, prohibits business entities with aggregate state contracts or pending state contract bids of more than $50,000 from making campaign contributions to any political committee established to promote the candidacy of, among others, a candidate for the office of Governor. This law also prohibits such contributions by affiliated entities and affiliated persons of such business entities.

## The Enterprise

2.    At times material to this indictment, defendant ROD BLAGOJEVICH, the Office of the Governor of Illinois, and Friends of Blagojevich were associated in fact, and constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce. This

enterprise is referred to for purposes of this count as the "Blagojevich Enterprise." The Blagojevich Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

## Purpose of the Enterprise

3.    The primary purpose of the Blagojevich Enterprise was to exercise and preserve power over the government of the State of Illinois for the financial and political benefit of defendant ROD BLAGOJEVICH, both directly and through Friends of Blagojevich, and for the financial benefit of his family members and associates.

## The Racketeering Conspiracy

4.    From in or about 2002 to on or about December 9, 2008, in the Northern District of Illinois and elsewhere,

ROD BLAGOJEVICH and
CHRISTOPHER KELLY,

defendants herein, together with Alonzo Monk, William F. Cellini, Sr., John Harris, Robert Blagojevich, Antoin Rezko, and Stuart Levine, being persons employed by and associated with an enterprise, namely the Blagojevich Enterprise, which enterprise engaged in, and the activities of which affected, interstate commerce, did conspire and agree, with each other and others known and unknown to the Grand Jury, to conduct and participate, directly and

9

indirectly, in the conduct of the affairs of the Blagojevich Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and (5), consisting of:

    a.    multiple acts indictable under the following provisions of federal law:

        i.    Title 18, United States Code, Sections 1341, 1343, and 1346 (mail fraud and wire fraud);

        ii.    Title 18, United States Code, Section 1951(a) (extortion, attempted extortion, and conspiracy to commit extortion); and

    b.    multiple acts involving bribery chargeable under the following provisions of Illinois law:

        720 ILCS 5/33-1(c) and (d).

5.    Each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## Means and Method of the Conspiracy

6.    It was part of the conspiracy that defendants ROD BLAGOJEVICH and CHRISTOPHER KELLY, as well as co-conspirators Alonzo Monk, William F. Cellini, Sr., John Harris, Robert Blagojevich, Antoin Rezko, and Stuart Levine, and others, engaged in a scheme to deprive the people of the State of Illinois and the beneficiaries of TRS of their intangible right to the honest services of defendant ROD BLAGOJEVICH, Alonzo Monk, John Harris, and

Stuart Levine, as more fully described in Count Two, paragraphs 3 through 44 of this indictment.

7.    It was further part of the conspiracy that defendants ROD BLAGOJEVICH and KELLY, along with Monk, Cellini, Robert Blagojevich, Harris, Rezko, and Levine, and others, used and attempted to use the powers of the Office of the Governor and of certain state boards and commissions subject to the influence of the Office of the Governor, to take and cause governmental actions, including: appointments to boards and commissions; the awarding of state business, grants, and investment fund allocations; the enactment of legislation and executive orders; and the appointment of a United States Senator; in exchange for financial benefits for themselves and others, including campaign contributions for ROD BLAGOJEVICH, money for themselves, and employment for ROD BLAGOJEVICH and his wife.

8.    It was further part of the conspiracy that defendant ROD BLAGOJEVICH permitted defendant KELLY and Rezko to exercise substantial influence over certain activities of the Office of the Governor, as well as state boards and commissions with members appointed by the Governor, with the knowledge that KELLY and Rezko would use this influence to enrich themselves and their associates.  In return, KELLY and Rezko provided benefits to ROD BLAGOJEVICH by (a) generating millions of dollars in contributions to Friends

11

of Blagojevich, and (b) providing financial benefits directly to ROD BLAGOJEVICH and his family members.

9.     It was further part of the conspiracy that in connection with the following acts, transactions, and matters, members of the conspiracy exercised their power and influence over Illinois state government for the purpose of benefitting defendant ROD BLAGOJEVICH and his family members, Friends of Blagojevich, and members of the conspiracy and their associates:

a.     Defendants ROD BLAGOJEVICH and KELLY, along with Rezko and Monk, agreed to direct lucrative state business relating to the refinancing of billions of dollars in State of Illinois Pension Obligation Bonds to a company whose lobbyist agreed to provide hundreds of thousands of dollars to Rezko out of the fee the lobbyist would collect, and Rezko in turn agreed to split the money with ROD BLAGOJEVICH, KELLY, and Monk;

b.     KELLY, Rezko, Cellini, and Levine agreed that KELLY and Rezko would use their influence with the Blagojevich administration to assist Cellini and Levine in maintaining influence over the activities of TRS, and in return, Cellini and Levine would use their influence with TRS to cause TRS to invest in funds, and to use the services of professional firms, selected by KELLY and Rezko, at times in exchange for substantial contributions to Friends of Blagojevich.

c.    Rezko arranged for a total of $50,000 in contributions to Friends of Blagojevich from Ali Ata, a Chicago-area businessman, and in exchange for those contributions discussed with Ata, ROD BLAGOJEVICH, and Monk obtaining a high-level state appointment for Ata, whom ROD BLAGOJEVICH ultimately appointed as the executive director of the Illinois Finance Authority;

d.    In response to a lobbyist's inquiry about how the lobbyist's clients could become eligible to manage investments for TRS, KELLY advised the lobbyist that TRS was Rezko's area, and subsequently advised the lobbyist that KELLY had spoken with Rezko, and that it would require a $50,000 campaign contribution to defendant ROD BLAGOJEVICH for a firm to get on TRS's list of recommended investment funds; and

e.    KELLY, Cellini, Rezko, Levine, and others agreed to demand that Thomas Rosenberg, the owner of Capri Capital, arrange to raise or donate substantial funds to Friends of Blagojevich, and to threaten that if such funds were not forthcoming, they would block a proposed TRS investment of $220 million with Capri Capital.

10.    It was further part of the conspiracy that Rezko provided defendant ROD BLAGOJEVICH and his family with financial benefits. In particular, Rezko: directed a real estate commission in the amount of approximately

$14,396 to the wife of ROD BLAGOJEVICH, even though she had done no work to earn that commission; subsequently hired the wife of ROD BLAGOJEVICH as an employee of Rezko's real estate business at a salary of approximately $12,000 per month; and supplemented her salary by directing another real estate commission to her in the amount of approximately $40,000, even though she had done little or no work to earn that commission.

11.    It was further part of the conspiracy that after it became public that defendant KELLY and Rezko were under law enforcement scrutiny and they ceased to play significant roles in raising funds for Friends of Blagojevich, defendant ROD BLAGOJEVICH continued to exchange and attempt to exchange his official actions as Governor for personal benefits to ROD BLAGOJEVICH and members of his family, and contributions to Friends of Blagojevich. At times, ROD BLAGOJEVICH acted with the assistance of others, including Monk, Harris, and Robert Blagojevich. These efforts included, but were not limited to, attempts to:

a.    withhold a state grant to benefit a publicly-supported school until a campaign fundraiser for ROD BLAGOJEVICH was held by a United States Congressman who supported the school, or by a relative of that United States Congressman;

14

b.     extort a campaign contribution from Children's Memorial Hospital, a not-for-profit children's hospital located in Chicago, Illinois, and its chief executive officer, in return for official action on state reimbursement for pediatric care;

c.     extort a campaign contribution from two horse racing tracks and an executive associated with them, in return for prompt action on legislation financially benefitting horse racing tracks;

d.     extort a campaign contribution from a company that supplied materials for road construction, and from an executive of that company (who was also a representative of a road construction industry trade organization), in return for official action financially benefitting that company and the road construction industry;

e.     withhold state financial support that would benefit the Tribune Company, publisher of the Chicago Tribune newspaper, unless the Tribune Company fired editorial board members who had been critical of ROD BLAGOJEVICH; and

f.     obtain personal financial benefits for ROD BLAGOJEVICH in return for his appointment of a United States Senator to fill the seat vacated by President Barack Obama.

15

12. It was further part of the conspiracy that defendants ROD BLAGOJEVICH and KELLY, and other members of the conspiracy, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purposes of and the acts done in furtherance of the conspiracy;

In violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1. Paragraph 1 of Count One is hereby realleged and incorporated as if fully set forth herein.

2. From in or about 2002 to on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, defendants ROD BLAGOJEVICH, ALONZO MONK, JOHN HARRIS, and ROBERT BLAGOJEVICH, together with Christopher Kelly, William Cellini, Antoin Rezko, Stuart Levine, and others, devised and participated in a scheme to deprive the people of the State of Illinois and the beneficiaries of TRS of their intangible right to the honest services of ROD BLAGOJEVICH, HARRIS, MONK, and Levine.

### Overview of the Scheme

3. It was part of the scheme to defraud that defendants ROD BLAGOJEVICH, MONK, HARRIS, and ROBERT BLAGOJEVICH, together with Kelly, Cellini, Rezko, Levine, and others, used and attempted to use the powers of the Office of the Governor, and of certain state boards and commissions subject to influence by the Office of the Governor, to take and cause governmental actions, including: appointments to boards and commissions; the awarding of state business, grants, and investment fund allocations; the enactment of legislation and executive orders; and the appointment of a United

States Senator; in exchange for financial benefits for themselves and others, including campaign contributions for ROD BLAGOJEVICH, money for themselves, and employment for ROD BLAGOJEVICH and his wife.

## Sharing Financial Benefits from State Actions

4.     It was further part of the scheme that, in a series of conversations that began in 2002 and continued after defendant ROD BLAGOJEVICH was elected Governor in November 2002, defendants ROD BLAGOJEVICH and MONK, along with Kelly and Rezko, agreed that they would use ROD BLAGOJEVICH's position as Governor and MONK's position as Chief of Staff for financial gain, which would be divided among them, with the understanding that the money would be distributed after ROD BLAGOJEVICH left public office. The defendants and their co-schemers later implemented this agreement, including in connection with a transaction involving state Pension Obligation Bonds as further described below.

## The Pension Obligation Bond Deal

5.     It was further part of the scheme that in or about 2003, defendants ROD BLAGOJEVICH and MONK, and Kelly and Rezko, agreed to direct lucrative state business relating to the refinancing of billions of dollars in State of Illinois Pension Obligation Bonds to a company whose lobbyist agreed to provide hundreds of thousands of dollars to Rezko out of the fee the lobbyist

would collect, and Rezko in turn agreed to split the money with ROD BLAGOJEVICH, MONK, and Kelly.

## Maintaining Control Over TRS

6. It was further part of the scheme that in or about the spring of 2003, Kelly, Rezko, Cellini, and Levine agreed that Kelly and Rezko would use their influence with the Blagojevich administration to assist Cellini and Levine in maintaining influence over the activities of TRS, and in return, Cellini and Levine would use their influence with TRS to cause TRS to invest in funds, and to use the services of law firms, selected by Kelly and Rezko, at times in exchange for substantial contributions to Friends of Blagojevich.

## The Solicitation of Ali Ata

7. It was further part of the scheme that in or about late 2002, Ali Ata, an Illinois businessman who was solicited by Rezko to make political contributions to defendant ROD BLAGOJEVICH, brought a $25,000 check to Rezko's offices, where Ata met with ROD BLAGOJEVICH. During that meeting, ROD BLAGOJEVICH asked Rezko if Rezko had talked to Ata about positions in the administration, and Rezko said that he had. In or about July 2003, after discussions with Rezko about possible state appointments, Ata gave Rezko another $25,000 check payable to ROD BLAGOJEVICH's campaign. Shortly after this, Ata had a conversation with ROD BLAGOJEVICH at a fundraising

19

event, during which ROD BLAGOJEVICH indicated that he was aware Ata recently had made another substantial contribution to ROD BLAGOJEVICH's campaign, and told Ata that he understood Ata would be joining his administration. Ata replied that he was considering taking a position, and ROD BLAGOJEVICH said that it had better be a job where Ata could make some money. ROD BLAGOJEVICH ultimately appointed Ata as the executive director of the Illinois Finance Authority.

### The Solicitation of Joseph Cari

8.     It was further part of the scheme that on or about October 29, 2003, when Joseph Cari, a national Democratic fundraiser, was traveling on a plane with defendant ROD BLAGOJEVICH, Kelly, and Levine to a Blagojevich fundraiser in New York hosted by Cari, he spoke with ROD BLAGOJEVICH, who discussed Cari's background as a national fundraiser and ROD BLAGOJEVICH's interest in running for President. ROD BLAGOJEVICH said it was easier for governors to solicit campaign contributions because of their ability to award contracts and give legal work, consulting work, and investment banking work to campaign contributors, and that Kelly and Rezko were his point people in raising campaign contributions. ROD BLAGOJEVICH also said there were state contracts and other state work that could be given to contributors

who helped ROD BLAGOJEVICH, Rezko, and Kelly, and that Rezko and Kelly would follow up with Cari in relation to the discussion that had just occurred.

9.      It was further part of the scheme that during the October 29, 2003, fundraiser, Levine told Cari that there was a plan in place in the Blagojevich administration pursuant to which Rezko and Kelly would pick consultants to do business with State of Illinois boards, and, thereafter, the consultants would be asked to make campaign contributions.

10.     It was further part of the scheme that sometime after October 2003, Rezko told Cari that Rezko had a close relationship with the Blagojevich administration, that Rezko had a role in picking consultants, law firms and other entities to get state business, and that defendant ROD BLAGOJEVICH's Chief of Staff, defendant MONK, helped implement Rezko's choices for state work.    Rezko also said that, in exchange for raising money for ROD BLAGOJEVICH, the Blagojevich administration would be helpful to Cari's business interests.

11.     It was further part of the scheme that on or about March 5, 2004, Cari met with Kelly, who said he was following up on Cari's conversations with defendant ROD BLAGOJEVICH, Rezko, and Levine. Kelly asked for Cari's help in raising money on a national level for ROD BLAGOJEVICH. When Cari said he was not inclined to help, Kelly pushed Cari to assist and said that helping

21

ROD BLAGOJEVICH would be good for Cari's business interests and that Cari could have whatever Cari wanted if he agreed to help.

### Campaign Contributions Solicited for TRS Investments

12.    It was further part of the scheme that in or about March 2004, Lobbyist A met with Christopher Kelly to ask how two clients of Lobbyist A could become eligible to manage investments for TRS. Kelly informed Lobbyist A that TRS was Rezko's area, and subsequently told Lobbyist A that he had spoken with Rezko, and that it would require a $50,000 campaign contribution to defendant ROD BLAGOJEVICH for a firm to get on TRS's list of recommended fund managers.

### The Attempted Extortion of Capri Capital

13.    It was further part of the scheme that in about April 2004, Levine, Rezko, and Kelly agreed that unless Capri Capital or one of its principals, Thomas Rosenberg, arranged to raise or make significant political contributions for defendant ROD BLAGOJEVICH, Capri Capital would not receive a proposed $220 million investment from TRS. They further agreed that William F. Cellini, Sr. would deliver that message to Rosenberg.

14.    It was further part of the scheme that in or about early May 2004, Levine advised Cellini of the plan to require Rosenberg to raise or make significant political contributions for defendant ROD BLAGOJEVICH as a

condition for Capri Capital's receipt of the $220 million in TRS funds, and Cellini assisted the plan by indicating to Rosenberg that Capri Capital had not yet received its $220 million allocation from TRS because of its failure to make political donations to defendant ROD BLAGOJEVICH.

15.    It was further part of the scheme that after Rosenberg advised Cellini that Rosenberg would not be extorted, and threatened to expose the extortion attempt, Cellini ensured that Kelly, Rezko, and Levine learned about Rosenberg's threat to expose their extortion attempt.

16.    It was further part of the scheme that on or about May 11, 2004, Cellini, Levine, Rezko, and Kelly agreed that in light of Rosenberg's threat to inform law enforcement about the extortion, it was too risky to continue demanding money from Rosenberg or to block the $220 million allocation to Capri Capital. They agreed that although Capri Capital would receive the $220 million allocation, it would not receive any further business from any State of Illinois entity, including TRS.

17.    It was further part of the scheme that Rezko told Cellini and Levine, in separate conversations, that defendant ROD BLAGOJEVICH had been told about the attempt to extort Rosenberg, and ROD BLAGOJEVICH had said that Rosenberg meant nothing to him.

18.     It was further part of the scheme that after the discussion involving Kelly, Rezko, Levine, and Cellini on or about May 11, 2004, Cellini and Levine took steps to conceal the extortion plan, including by using their influence and Levine's position at TRS to ensure that Capri Capital received its $220 million allocation.

### Benefits Given to ROD BLAGOJEVICH and ALONZO MONK

19.     It was further part of the scheme that to ensure that defendants ROD BLAGOJEVICH and MONK would continue to give Rezko substantial influence regarding matters such as appointments to boards and commissions, the selection of candidates for state employment, and the awarding of state contracts, grants, and investment fund allocations, Rezko gave certain benefits to ROD BLAGOJEVICH and MONK, including the following:

a.     In or about late August 2003, Rezko directed to ROD BLAGOJEVICH's wife a payment of $14,396, purportedly in connection with a real estate transaction involving property at 850 North Ogden Avenue, Chicago, Illinois, for which transaction ROD BLAGOJEVICH's wife had not performed any services.

b.     From in or about October 2003 to in or about May 2004, Rezko, through his real estate development company, provided ROD BLAGOJEVICH's

wife with payments of $12,000 a month, purportedly for real estate brokerage services.

        c.    In or about January 2004, while Rezko's real estate development company was paying ROD BLAGOJEVICH's wife $12,000 a month, Rezko directed to ROD BLAGOJEVICH's wife a payment of $40,000, purportedly for brokerage services in connection with the sale of property at 1101 West Lake Street, Chicago, Illinois, even though ROD BLAGOJEVICH's wife had provided few, if any, services in relation to that sale.

        d.    From in or about the spring of 2004 until in or about 2006, Rezko provided to MONK a number of $10,000 cash gifts to pay for various items, such as a car and home improvements, which cash gifts totaled approximately $70,000 to $90,000.

### The Search for Employment for ROD BLAGOJEVICH's Wife

    20.    It was further part of the scheme that after the real estate business of defendant ROD BLAGOJEVICH's wife became the subject of critical media coverage, ROD BLAGOJEVICH directed defendant HARRIS to try to find a paid state board appointment or position for her. During several conversations in or about early 2008, ROD BLAGOJEVICH informed HARRIS that ROD BLAGOJEVICH wanted his wife put on the Pollution Control Board, which pays salaries to its board members. When HARRIS told ROD BLAGOJEVICH that

his wife was not qualified for the position, ROD BLAGOJEVICH told HARRIS to find other employment for his wife.

21.    It was further part of the scheme that, in or about the spring of 2008, around the time that defendant ROD BLAGOJEVICH's wife passed a licensing examination that allowed her to sell financial securities, ROD BLAGOJEVICH asked defendant HARRIS and others to set up informational or networking meetings for his wife with financial institutions that had business with the State of Illinois in hopes that those businesses would assist in getting ROD BLAGOJEVICH's wife a job.  HARRIS subsequently arranged meetings between ROD BLAGOJEVICH's wife and officials at two financial institutions that had business with the State of Illinois.   When ROD BLAGOJEVICH concluded that officials at these institutions were unhelpful in finding ROD BLAGOJEVICH's wife a job, ROD BLAGOJEVICH told HARRIS that he did not want the institutions receiving further business from the State of Illinois.

## Attempted Extortion of United States Congressman A

22.    It was further part of the scheme that in or about 2006, after United States Congressman A inquired about the status of a $2 million grant for the benefit of a publicly-supported school, defendant ROD BLAGOJEVICH instructed defendant HARRIS not to release the grant until further direction from ROD BLAGOJEVICH, even though ROD BLAGOJEVICH previously had

agreed to support the grant and funding for the grant had been included in the state's budget.

23. It was further part of the scheme that, in response to inquiries by a high-ranking state official as to whether the grant money could be released, defendant ROD BLAGOJEVICH informed the official that ROD BLAGOJEVICH wanted it communicated to United States Congressman A that United States Congressman A's brother needed to have a fundraiser for ROD BLAGOJEVICH.

24. It was further part of the scheme that defendant ROD BLAGOJEVICH told Lobbyist A that ROD BLAGOJEVICH was giving a $2 million grant to a school in United States Congressman A's district and instructed Lobbyist A to approach United States Congressman A for a fundraiser.

25. It was further part of the scheme that after defendant ROD BLAGOJEVICH learned from defendant HARRIS that the school had started to incur expenses that were to be paid with the grant funds, ROD BLAGOJEVICH initially resisted the release of the grant money, and then ultimately agreed to the release of certain of the grant funds to cover incurred expenses, but only on a delayed basis, even though no fundraiser had been held.

## Attempted Extortion of Children's Memorial Hospital

26.    It was further part of the scheme that on or about October 8, 2008, defendant ROD BLAGOJEVICH advised Lobbyist A that he intended to take official action that would provide additional state money to Children's Memorial Hospital, and that ROD BLAGOJEVICH wanted to get $50,000 in campaign contributions from the Chief Executive Officer of Children's Memorial Hospital ("the Children's CEO").

27.    It was further part of the scheme that on or about October 17, 2008, defendant ROD BLAGOJEVICH called the Children's CEO to tell him of his intent to increase the Illinois Medicaid reimbursement rate for speciality-care pediatric physicians.  Shortly before this, ROD BLAGOJEVICH had directed Deputy Governor A to initiate such an increase, which Illinois providers of pediatric healthcare, including Children's Memorial Hospital, had actively supported for years.

28.    It was further part of the scheme that on or about October 22, 2008, defendant ROBERT BLAGOJEVICH spoke with the Children's CEO and asked him to arrange to raise $25,000 for ROD BLAGOJEVICH prior to January 1, 2009.

29.    It was further part of the scheme that on or about November 12, 2008, after the Children's CEO had not returned additional phone calls from

28

defendant ROBERT BLAGOJEVICH, and no political contributions from the Children's CEO or other persons associated with Children's Memorial Hospital had been received, defendant ROD BLAGOJEVICH spoke to Deputy Governor A about the increase in the Medicaid reimbursement rates for specialty-care pediatric physicians, asking whether "we could pull it back if we needed to. . . ." As a result of this conversation, Deputy Governor A instructed the Department of Healthcare Services to stop its work on increasing the reimbursement for specialty-care pediatric physicians.

### Attempted Extortion of Racetrack Executive

30.    It was further part of the scheme that on or about November 13, 2008, defendant ROD BLAGOJEVICH told defendant ROBERT BLAGOJEVICH that he wanted campaign contributions to be made by the end of the year by Racetrack Executive, who, as ROD BLAGOJEVICH knew, managed horse racing tracks that would financially benefit from a bill pending in the Illinois legislature that would require certain Illinois casinos to give money to a fund that would be used to help the Illinois horse racing industry (the "Racing Bill "). At that time, as ROD BLAGOJEVICH knew, defendant MONK had been trying to arrange a contribution from Racetrack Executive, and ROD BLAGOJEVICH had set a goal of raising $100,000 in contributions from and through Racetrack Executive.

31. It was further part of the scheme that defendant ROD BLAGOJEVICH had further conversations with defendant MONK about the Racing Bill after it was passed by the Illinois legislature on or about November 20, 2008. In those conversations, ROD BLAGOJEVICH and MONK discussed whether and when ROD BLAGOJEVICH would sign the bill, and whether and when Racetrack Executive would arrange for a campaign contribution to ROD BLAGOJEVICH. On or about December 3, 2008, ROD BLAGOJEVICH indicated to MONK that he was concerned that Racetrack Executive would not make a contribution by the end of the year if he signed the Racing Bill before the contribution was made. As a result, MONK and ROD BLAGOJEVICH agreed that MONK would speak with Racetrack Executive to ensure that Racetrack Executive would make a contribution by the end of the year.

32. It was further part of the scheme that after meeting with defendant ROD BLAGOJEVICH on or about December 3, 2008, defendant MONK visited Racetrack Executive. During that visit, MONK communicated to Racetrack Executive that ROD BLAGOJEVICH was concerned that Racetrack Executive would not make a contribution to ROD BLAGOJEVICH if the Racing Bill was signed before the contribution was made.

33. It was further part of the scheme that after meeting with Racetrack Executive on or about December 3, 2008, defendant MONK reported to

defendant ROD BLAGOJEVICH that MONK had said to Racetrack Executive, "look, there is a concern that there is going to be some skittishness if your bill gets signed because of the timeliness of the commitment," and made it clear to Racetrack Executive that the contribution has "got to be in now." ROD BLAGOJEVICH responded, "good," and "good job."

34.    It was further part of the scheme that on or about December 4, 2008, defendant MONK asked defendant ROD BLAGOJEVICH to call Racetrack Executive and to suggest that ROD BLAGOJEVICH would sign the Racing Bill, because this would be better "from a pressure point of view." ROD BLAGOJEVICH agreed to call Racetrack Executive.

### Attempted Extortion of Highway Contractor

35.    It was further part of the scheme that on or about September 18, 2008, defendants ROD BLAGOJEVICH, MONK, and ROBERT BLAGOJEVICH met with Construction Executive, who was both an executive with a company that manufactured and distributed road building materials and a representative of a trade group involved with the construction of roads. In that meeting, ROD BLAGOJEVICH said that he was planning on announcing a $1.5 billion road building program that would be administered through the Illinois Toll Highway Authority (the "Tollway") and that he might authorize an additional $6 billion road building program later on. Shortly thereafter in the conversation, ROD

BLAGOJEVICH asked for Construction Executive's help in raising contributions for ROD BLAGOJEVICH's campaign by the end of the year. After Construction Executive left the meeting, ROD BLAGOJEVICH instructed MONK to try to get Construction Executive to raise $500,000 in contributions. As ROD BLAGOJEVICH knew, MONK subsequently had a series of conversations with Construction Executive about the possibility of Construction Executive arranging for campaign contributions to ROD BLAGOJEVICH.

36.    It was further part of the scheme that, on or about October 6, 2008, defendant ROD BLAGOJEVICH told Lobbyist A that he would make an announcement concerning a $1.8 billion project involving the Tollway and that defendant MONK would approach Construction Executive to ask that he raise substantial campaign contributions. ROD BLAGOJEVICH further said that he could have announced a larger amount of money for road projects, but wanted to see how Construction Executive performed in raising contributions, and he added words to the effect of "If they don't perform, fuck 'em."

37.    It was further part of the scheme that, on or about October 22, 2008, approximately one week after defendant ROD BLAGOJEVICH publicly announced a portion of a $1.8 billion program to upgrade interchanges on the tollway system, ROD BLAGOJEVICH called Construction Executive, spoke with

him about the $1.8 billion program, and asked how he was coming with fundraising.

### Efforts to Obtain Personal Financial Benefits for Rod Blagojevich in Return for his Appointment of a United States Senator

38.     It was further part of the scheme that beginning in or about October 2008, and continuing until on or about December 9, 2008, defendant ROD BLAGOJEVICH, with the assistance of defendants HARRIS and ROBERT BLAGOJEVICH, and others, sought to obtain financial benefits for himself and his wife, in return for the exercise of his duty under Illinois law to appoint a United States Senator to fill the vacancy created by the election of Barack Obama as President of the United States.

39.     It was further part of the scheme that defendant ROD BLAGOJEVICH engaged in numerous conversations with others, at times including defendants HARRIS and ROBERT BLAGOJEVICH, certain high-ranking employees of the Office of the Governor, and certain political consultants, to devise and set in motion plans by which ROD BLAGOJEVICH could use his power to appoint a United States Senator to obtain financial benefits for himself and his wife.  At times ROD BLAGOJEVICH directed others, including state employees, to assist in these endeavors, including by performing research and conveying messages to third parties.

40. It was further part of the scheme that defendant ROD BLAGOJEVICH and his co-schemers devised and discussed means of using ROD BLAGOJEVICH's power to appoint a United States Senator in exchange for financial benefits for himself and his wife, which benefits would take the following forms, among others:

a. Presidential appointment of ROD BLAGOJEVICH to high-ranking positions in the federal government, including Secretary of Health and Human Services or an ambassadorship;

b. A highly paid leadership position with a private foundation dependent on federal aid, which ROD BLAGOJEVICH believed could be influenced by the President-elect to name ROD BLAGOJEVICH to such a position;

c. A highly paid leadership position with an organization known as "Change to Win," consisting of seven affiliated labor unions, which, in a transaction suggested by defendant HARRIS, could appoint ROD BLAGOJEVICH as its chairman with the expectation that the President-elect would assist Change to Win with its national legislative agenda;

d. Employment for the wife of ROD BLAGOJEVICH with a union organization or lobbying firm, or on corporate boards of directors;

e.    A highly paid leadership position with a newly-created not-for-profit corporation that ROD BLAGOJEVICH believed could be funded with large contributions by persons associated with the President-elect; and

f.    Substantial campaign fundraising assistance from individuals seeking the United States Senate seat and their backers, including from Senate Candidate A, whose associate ROD BLAGOJEVICH understood to have offered $1.5 million in campaign contributions in return for ROD BLAGOJEVICH's appointment of Senate Candidate A.

41.    It was further part of the scheme that defendant ROD BLAGOJEVICH discussed with his co-schemers means by which he could influence the President-elect to assist ROD BLAGOJEVICH in obtaining personal benefits for himself and his wife, including by appointing as United States Senator a candidate whom ROD BLAGOJEVICH believed to be favored by the President-elect. At times, ROD BLAGOJEVICH attempted to further this goal by conveying messages, directly and with the assistance of others, to individuals whom he believed to be in communication with the President-elect.

42.    It was further part of the scheme that on or about December 4, 2008, defendant ROD BLAGOJEVICH instructed defendant ROBERT BLAGOJEVICH to contact a representative of Senate Candidate A, and advise the representative that if Senate Candidate A was going to be chosen to fill the

35

Senate seat, some of the promised fundraising had to occur before the appointment. ROD BLAGOJEVICH instructed ROBERT BLAGOJEVICH to communicate the urgency of the message, and to do it in person, rather than over the phone. ROBERT BLAGOJEVICH agreed to do so, and thereafter arranged a meeting with an associate of Senate Candidate A.

43.  It was further part of the scheme that on or about December 5, 2008, following the publication that day of a newspaper article reporting that ROD BLAGOJEVICH had been surreptitiously recorded in connection with an ongoing federal investigation, ROD BLAGOJEVICH instructed ROBERT BLAGOJEVICH to cancel his meeting with the associate of Senate Candidate A, and ROBERT BLAGOJEVICH agreed to do so.

44.  It was further part of the scheme that defendants ROD BLAGOJEVICH and KELLY, and other participants in the scheme, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purposes of and the acts done in furtherance of the scheme.

45.  On or about October 17, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication

36

in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and the Children's CEO in Florida, in which ROD BLAGOJEVICH asked the Children's CEO for a campaign contribution;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT THREE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1 through 44 of Count Two are realleged and incorporated as if fully set forth herein.

2.     On or about November 1, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH and<br>ROBERT BLAGOJEVICH,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and ROBERT BLAGOJEVICH in Nashville, Tennessee, in which ROBERT BLAGOJEVICH gave ROD BLAGOJEVICH an update on the solicitation of campaign contributions from Construction Executive and Racetrack Executive, and they discussed potential contributions from Senate Candidate C and Senate Candidate A;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT FOUR

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraphs 1 through 44 of Count Two are realleged and incorporated as if fully set forth herein.

2.    On or about November 7, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH and<br>
JOHN HARRIS,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH and HARRIS, in Chicago, Illinois, and Advisor A, in Washington, D.C., in which ROD BLAGOJEVICH, HARRIS, and Advisor A discussed financial benefits which ROD BLAGOJEVICH could request in exchange for the appointment of Senate Candidate B to the United States Senate;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT FIVE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraphs 1 through 44 of Count Two are realleged and incorporated as if fully set forth herein.

2.    On or about November 10, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a conference call between ROD BLAGOJEVICH, John Harris and others, in Chicago, Illinois, and various advisors in Washington, D.C., and New York City, in which they discussed financial benefits which ROD BLAGOJEVICH could request in exchange for the appointment of Senate Candidate B to the United States Senate;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT SIX

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1 through 44 of Count Two are realleged and incorporated as if fully set forth herein.

2.     On or about November 12, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH, in Chicago, Illinois, and Advisor A in Washington, D.C. (Sessions 533 and 535), in which they discussed a proposal where, in exchange for the appointment of Senate Candidate B to the United States Senate, a not-for-profit organization would be set up where ROD BLAGOJEVICH would be employed when he was no longer governor;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT SEVEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1 through 44 of Count Two are realleged and incorporated as if fully set forth herein.

2.     On or about November 12, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and a labor union official in Washington, D.C. (Session 541), in which ROD BLAGOJEVICH proposed that, in exchange for the appointment of Senate Candidate B to the United States Senate, a not-for-profit organization be set up where ROD BLAGOJEVICH would be employed when he was no longer governor;

In violation of Title 18, United States Code, Sections 1343 and 1346.

42

## COUNT EIGHT

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1. Paragraphs 1 through 44 of Count Two are realleged and incorporated as if fully set forth herein.

2. On or about November 12, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and a labor union official in Washington, D.C. (Session 546), in which ROD BLAGOJEVICH informed the union official that it was a very real possibility that Senate Candidate B could get the United States Senate appointment, and again raised his interest in employment by a not-for-profit organization;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT NINE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1 through 44 of Count Two are realleged and incorporated as if fully set forth herein.

2.      On or about November 13, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Advisor B in Michigan (Session 624), in which they discussed presenting to United States Congressman A a proposal by ROD BLAGOJEVICH that a not-for-profit organization be set up and that the connection between setting up this organization and the awarding of the U.S. Senate seat would be "unsaid";

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT TEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1 through 44 of Count Two are realleged and incorporated as if fully set forth herein.

2.     On or about November 13, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Advisor B in Michigan (Session 627), in which ROD BLAGOJEVICH asked Advisor B to call Lobbyist A and ask Lobbyist A to present to United States Congressman A ROD BLAGOJEVICH's proposal that a not-for-profit organization be set up and that, while it would be unsaid, this would be a "play" to obtain a benefit for ROD BLAGOJEVICH in return for the awarding of the United States Senate seat;

In violation of Title 18, United States Code, Sections 1343 and 1346.

45

## COUNT ELEVEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1 through 44 of Count Two are realleged and incorporated as if fully set forth herein.

2.     On or about December 4, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH and<br>
ALONZO MONK,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and MONK in Miami, Florida, in which BLAGOJEVICH agreed with MONK that, in order to obtain the campaign contribution sought from Racetrack Executive in exchange for a prompt signing of the Racing Bill, it would be better "from a pressure point of view" for BLAGOJEVICH himself to call Racetrack Executive to discuss the timing of signing the Racing Bill;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT TWELVE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1 through 44 of Count Two are realleged and incorporated as if fully set forth herein.

2.      On or about December 4, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH and
ROBERT BLAGOJEVICH,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH and Deputy Governor A in Chicago, Illinois, and Advisor A in Washington, D.C., in which ROD BLAGOJEVICH said that if he gave the Senate seat to Senate Candidate A, there would be "tangible political support . . . specific amounts and everything . . . . some of it up front";

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT THIRTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1. Paragraphs 1(a) through 1(d), 1(h) through 1(k), and 1(m)(iii) through 1(m)(vii) of Count One are realleged and incorporated as if fully set forth herein.

2. At times material to this Count of the Superseding Indictment:

a. It was the ordinary course of business for TRS to use the U.S. mails, private and commercial interstate carriers, and wirings in interstate commerce, in the course of making investments.

b. TRS Staffer A was the Executive Director of TRS. In that position, TRS Staffer A had significant influence over the investments made by TRS. TRS Staffer A was a longtime associate of defendant WILLIAM F. CELLINI, SR., and CELLINI and TRS Staffer A discussed matters involving TRS, including matters that affected Commonwealth Realty Advisors.

c. Steven Loren was a lawyer. He and his law firm were outside counsel for TRS.

d. On or about February 20, 2004, the TRS Board approved allocations of TRS funds to four real estate management firms, including allocations totaling $220 million to defendant CELLINI's firm, Commonwealth Realty Advisors. Prior to the February 2004 TRS Board meeting, TRS staff had

48

planned to recommend that Capri Capital also receive allocations totaling $220 million at the February 2004 TRS Board meeting. Prior to the February 2004 TRS Board meeting, Levine used his influence and position at TRS to change the TRS staff recommendation with respect to the $220 million allocation to Capri Capital. The TRS Board did not approve any allocation of TRS funds to Capri Capital at the February 2004 TRS Board meeting.

e.     Pursuant to the laws of the State of Illinois relating to pensions (40 ILCS 5/1109), Levine, as a member of the TRS Board, was required to discharge his duties solely in the interest of TRS participants and beneficiaries and (a) for the exclusive purpose of providing benefits to TRS participants and their beneficiaries, and (b) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person would use.

f.     Pursuant to the laws of the State of Illinois relating to pensions (40 ILCS 5/1110), Levine, as a member of the TRS Board, was prohibited from (a) dealing with the assets of TRS in his own interest or for his own account, and (b) receiving any consideration for his own personal account from any party dealing with TRS in connection with a transaction involving the assets of TRS.

g.     Pursuant to the State Officials and Employees Ethics Act (5 ILCS 430/5-50), effective December 9, 2003, Levine, as a member of the TRS Board, was prohibited from having any material communications with a representative of a party concerning a pending matter, or *ex parte* contacts, without reporting that contact to the TRS Board in writing.

### The Conspiracy To Defraud

3.     Beginning no later than in and about the spring of 2003 and continuing through in or about the summer of 2005, in the Northern District of Illinois, Eastern Division, and elsewhere,

CHRISTOPHER KELLY, and
WILLIAM F. CELLINI, SR.,

defendants herein, together with Stuart Levine, Antoin Rezko, Steven Loren, and others known and unknown to the Grand Jury, did conspire and agree with each other to devise and participate in a scheme to deprive the beneficiaries of TRS of their intangible right to Levine's honest services, and it was foreseeable that for the purposes of executing and attempting to execute such scheme, one or more members of the conspiracy would use and cause the use of the United States mails and private and commercial interstate carriers, and the transmission of a wire communication in interstate commerce, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346.

50

## Overview

4.     It was part of the conspiracy that defendants CELLINI and KELLY,
together with Levine and Rezko, agreed to and did use their influence at TRS
and Levine's position at TRS to arrange for TRS to invest with and hire firms
that made contributions for the benefit of Rod Blagojevich.   As CELLINI,
KELLY, and Rezko knew, Levine agreed to use his influence and position at TRS
to help the firms that had made contributions for the benefit of Blagojevich even
though Levine understood that those firms were being chosen based on their
political contributions.

5.     It was further part of the conspiracy that defendants CELLINI and
KELLY, together with Levine and Rezko, agreed that they would use their
influence and Levine's position at TRS to prevent Thomas Rosenberg's firm,
Capri Capital, from receiving a planned $220 million allocation of TRS funds
unless Rosenberg and Capri Capital agreed to raise or donate a substantial
amount of funds for the benefit of Rod Blagojevich. When Rosenberg threatened
to expose the plan, CELLINI, KELLY, Levine, and Rezko acted together to
prevent Rosenberg from telling law enforcement about the extortion plan. As a
result of Rosenberg's threat, CELLINI, KELLY, Levine, and Rezko agreed that
Capri Capital would receive the $220 million allocation, but that Capri Capital
and Rosenberg would receive no further funds from the State of Illinois.

6.    It was further part of the conspiracy that defendants CELLINI and KELLY, and Rezko, agreed to and did engage in *ex parte* communications with Levine, other TRS trustees, and TRS staff members, including TRS Staffer A, concerning official actions and related matters pending before TRS.    As CELLINI and KELLY were aware, Levine concealed from and failed to disclose to the TRS Board the existence and nature of these *ex parte* communications.

7.    It was further part of the conspiracy that, as defendants CELLINI and KELLY knew, Levine concealed from and failed to disclose to the TRS Board material facts concerning the benefits that Levine sought to obtain for and on behalf of CELLINI, KELLY, Levine, Rezko, Rod Blagojevich, and others for official actions taken by TRS.

## Maintaining Control Over TRS

8.    It was further part of the conspiracy that in or about the spring of 2003, defendant CELLINI and Levine agreed that CELLINI would ask defendant KELLY and Rezko to use their influence with the Blagojevich administration to defeat a proposal to consolidate TRS with two other State of Illinois pension funds.    Such a consolidation would have jeopardized the influence that CELLINI and Levine had over the activities of TRS, as well as the profits received by Commonwealth Realty Advisors as an asset manager for TRS.

9.     It was further part of the conspiracy that defendant KELLY and Rezko agreed to and did use their influence with the Blagojevich administration to defeat the consolidation proposal and that, in return, defendant CELLINI and Levine agreed to use their influence with TRS to ensure that TRS selected asset managers and investment firms, and hired professional firms (including law firms), selected by KELLY and Rezko.  KELLY, CELLINI, Rezko, and Levine further agreed that CELLINI and Levine would use their influence with TRS to assist asset managers, investment funds, and professional firms that made substantial contributions to Friends of Blagojevich.

10.     It was further part of the conspiracy that defendant KELLY and Rezko used their influence with the Blagojevich administration to ensure that KELLY, Rezko, defendant CELLINI, and Levine retained their influence over the activities of TRS, including by ensuring that Rod Blagojevich reappointed Levine to an additional term on the TRS Board of Trustees in or about the spring of 2004.

11.     It was further part of the conspiracy that at times defendant KELLY and Rezko gave Levine the names of firms that KELLY and Rezko wanted TRS to invest with or hire, in exchange for past or prospective contributions to Friends of Blagojevich, and that Levine used his influence with TRS to assist those firms.

## Attempted Extortion of Thomas Rosenberg and Capri Capital

12.     It was further part of the conspiracy that in about April 2004, Levine told Rezko that they could force Thomas Rosenberg and Capri Capital to pay to obtain a potential $220 million allocation of TRS funds.   Levine and Rezko agreed that they would use their influence and Levine's position at TRS to prevent Capri Capital from receiving its $220 million allocation unless Capri Capital or one of its principals, Rosenberg, agreed to make a payment as Levine and Rezko directed.  Levine, Rezko, and defendant KELLY further agreed that if Rosenberg and Capri Capital arranged to raise a significant amount of money in campaign contributions for the benefit of Rod Blagojevich, then Levine, Rezko, and KELLY would permit Capri Capital to receive the $220 million allocation from TRS. Levine, Rezko, and KELLY further agreed that Levine would arrange for defendant CELLINI to communicate to Rosenberg that Capri Capital was not going to receive its $220 million allocation because of Rosenberg's failure to make a significant political contribution for the benefit of Blagojevich.

13.     It was further part of the conspiracy that in or about early May 2004, Levine informed defendant CELLINI about the plan to require Rosenberg and Capri Capital to raise or donate money for the benefit of Rod Blagojevich in order for Capri Capital to receive its $220 million allocation from TRS. CELLINI agreed to tell Rosenberg that Capri Capital was not going to receive

54

its $220 million allocation because Rosenberg had not made a significant contribution for the benefit of Blagojevich. CELLINI and Levine agreed that once Rosenberg understood that the reason Capri Capital was not going to receive its $220 million allocation was because of Rosenberg's failure to make a significant contribution for the benefit of Blagojevich, CELLINI would direct Rosenberg to talk with Levine so that Levine could discuss with Rosenberg how Rosenberg and Capri Capital could make the necessary contributions for the benefit of Blagojevich to ensure that Capri Capital would receive its $220 million allocation.

14.    It was further part of the conspiracy that on or about May 6, 2004, Levine told TRS Staffer A that defendant CELLINI was going to tell Rosenberg that Rezko was shocked that Rosenberg wanted to receive the $220 million allocation from TRS without having made any political contributions for the benefit of Blagojevich and that Rosenberg was going to have to deal with Rezko.

15.    It was further part of the conspiracy that on or about May 7, 2004, defendant CELLINI told Rosenberg that there had been a meeting involving Rezko and defendant KELLY concerning plans for raising political donations for the benefit of Rod Blagojevich from pension fund managers, and that during this meeting Rezko had observed that Capri Capital had a lot of TRS funds under management but had not made any political donations for the benefit of

Blagojevich. CELLINI told Rosenberg words to the effect that Capri Capital had not received its $220 million allocation from TRS because of its failure to make political donations for the benefit of Blagojevich.

16. It was further part of the conspiracy that on or about May 7, 2004, after defendant CELLINI told Rosenberg about the reasons that Capri Capital had not received its $220 million allocation, CELLINI called Levine. In that call, CELLINI told Levine about Rosenberg's reaction when CELLINI had explained to Rosenberg that Capri Capital would not receive the $220 million allocation because Rosenberg had failed to make a political donation for the benefit of Rod Blagojevich.

17. It was further part of the conspiracy that on or about May 8, 2004, defendant CELLINI called Levine and reported on another conversation CELLINI had with Rosenberg earlier that day in which Rosenberg advised CELLINI that Rosenberg would not be extorted. CELLINI further told Levine that Rosenberg had threatened to inform law enforcement about the extortion. CELLINI and Levine discussed ways in which they could deal with Rosenberg's threat to inform law enforcement about the extortion.

18. It was further part of the conspiracy that on or about May 10, 2004, defendant CELLINI informed defendant KELLY about Rosenberg's threat to expose the extortion plan.

19.     It was further part of the conspiracy that on or about May 10, 2004, defendant CELLINI told Levine about CELLINI's prior conversation with defendant KELLY about Rosenberg's threat to expose the extortion plan. In that conversation, CELLINI and Levine further discussed ways in which they could discourage Rosenberg from going to law enforcement to expose the extortion plan.

20.     It was further part of the conspiracy that on or about May 11, 2004, defendants CELLINI and KELLY, together with Stuart Levine and Rezko, agreed that in light of Rosenberg's threat to inform law enforcement about the extortion, it was too risky to continue demanding money from Rosenberg and Capri Capital or blocking the $220 million allocation to Capri Capital.

21.     It was further part of the conspiracy that defendants CELLINI and KELLY, together with Levine and Rezko, agreed that although Capri Capital would receive the $220 million allocation, it would not receive any further business from any State of Illinois entity, including TRS.

22.     It was further part of the conspiracy that after the discussion involving defendants CELLINI and KELLY, and Levine and Rezko, on or about May 11, 2004, CELLINI spoke with Thomas Rosenberg on several occasions for the purpose of discouraging him from disclosing the extortion attempt, falsely advising Rosenberg that Rezko, Levine, and KELLY had nothing to do with

Capri Capital's failure to receive its $220 million allocation, and representing that CELLINI and Levine had used their influence with TRS staff to ensure that Capri Capital would receive its allocation.

23. It was further part of the conspiracy that after the meeting on or about May 11, 2004, defendant CELLINI and Levine used their influence and Levine's position at TRS to ensure that Capri Capital received its $220 million allocation at the next TRS Board meeting so that the extortion plan against Rosenberg and Capri Capital would not be revealed. On or about May 25, 2004, the TRS Board, including Levine, voted to allocate a total of $220 million to Capri Capital.

## Concealment

24. It was further part of the conspiracy that defendants CELLINI and KELLY, together with Levine, Rezko, and their co-conspirators, did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts.

25. It was further part of the conspiracy that in or around the summer of 2004, defendants CELLINI and KELLY, and Rezko and others, discussed moving TRS Staffer A from his position at TRS into another job with a different

state entity in an effort to ensure that TRS Staffer A would not cooperate with law enforcement authorities.

26. It was further part of the conspiracy that in or around the summer and fall of 2004, in an effort to conceal the conspiracy, defendant CELLINI, Rezko and others discussed the possibility of removing the U.S. Attorney for the Northern District of Illinois in an effort to stop any investigation into the co-conspirators and others;

In violation of Title 18, United States Code, Section 1349.

## COUNT FOURTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraphs 1 and 2 of Count Thirteen of this Superseding Indictment are realleged and incorporated as if fully set forth herein.

2.    Beginning in or about April 2004 and continuing through at least in or about the summer of 2005, in the Northern District of Illinois, Eastern Division, and elsewhere,

CHRISTOPHER KELLY, and
WILLIAM F. CELLINI, SR.,

defendants herein, did conspire with Stuart Levine, Antoin Rezko, and others, to commit extortion, which extortion would obstruct, delay, and affect commerce, in that they attempted to obtain property, in the form of political contributions for the benefit of Rod Blagojevich from Thomas Rosenberg and Capri Capital, with Rosenberg's and Capri Capital's consent induced under the color of official right, and by the wrongful use of actual and threatened fear of economic harm.

### Overview of the Conspiracy

3.    It was part of the conspiracy that defendants CELLINI and KELLY, together with Levine and Rezko, agreed that they would use their influence and Levine's position at TRS to prevent Thomas Rosenberg's firm, Capri Capital, from receiving a planned $220 million allocation of TRS funds unless Rosenberg and Capri Capital agreed to raise or donate a substantial amount of money in

60

the form of campaign contributions for the benefit of Rod Blagojevich. When Rosenberg threatened to expose the plan, CELLINI, KELLY, Levine, and Rezko acted together to prevent Rosenberg from telling law enforcement about the extortion plan. As a result of Rosenberg's threat, CELLINI, KELLY, Levine, and Rezko agreed that Capri Capital would receive the $220 million allocation, but that Capri Capital and Rosenberg would receive no further funds from the State of Illinois.

4.    Paragraphs 12 through 26 of Count Thirteen of this Superseding Indictment are realleged and incorporated as if fully set forth herein;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT FIFTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraphs 1 and 2 of Count Thirteen are realleged and incorporated as though fully set forth herein.

2.    Beginning in or about April 2004 and continuing through at least in or about the summer of 2005, in the Northern District of Illinois, Eastern Division, and elsewhere,

CHRISTOPHER KELLY, and
WILLIAM F. CELLINI, SR.,

defendants herein, together with Stuart Levine, Antoin "Tony" Rezko, and others, did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of Rod Blagojevich from Thomas Rosenberg and Capri Capital, with Rosenberg's and Capri Capital's consent induced under the color of official right, and by the wrongful use of actual and threatened fear of economic harm;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT SIXTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraph 1(a) of Count One is realleged and incorporated as though fully set forth herein.

2.    Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH,

defendant herein, and others did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from the Chief Executive Officer of Children's Memorial Hospital, and Children's Memorial Hospital, with the consent of the Chief Executive Officer and Children's Memorial Hospital induced under the color of official right, and by the wrongful use of actual and threatened fear of economic harm;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT SEVENTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1(a) and 1(e) of Count One are realleged and incorporated as though fully set forth herein.

2.     Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH,

defendant herein, did conspire with Alonzo Monk and others to commit extortion, which extortion would obstruct, delay, and affect commerce, in that they attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from Racetrack Executive and two horse racing tracks with which Racetrack Executive was affiliated, with the consent of Racetrack Executive and the horse racing tracks induced under the color of official right, and by the wrongful use of actual and threatened fear of economic harm.

3.     It was part of the conspiracy that on or about November 13, 2008, defendant ROD BLAGOJEVICH told Robert Blagojevich that he wanted campaign contributions to be raised by the end of the year by Racetrack Executive, who, as ROD BLAGOJEVICH knew, managed horse racing tracks

that would financially benefit from a bill pending in the Illinois legislature that would require certain Illinois casinos to give money to a fund that would be used to help the Illinois horse racing industry (the "Racing Bill"). At that time, as ROD BLAGOJEVICH knew, Monk had been trying to arrange a contribution from Racetrack Executive, and ROD BLAGOJEVICH had set a goal of raising $100,000 in contributions from and through Racetrack Executive.

4.      It was further part of the conspiracy that defendant ROD BLAGOJEVICH had further conversations with Monk about the Racing Bill after it was passed by the Illinois legislature on or about November 20, 2008. In those conversations, ROD BLAGOJEVICH and Monk discussed whether ROD BLAGOJEVICH would sign the bill, and whether and when Racetrack Executive would arrange for a campaign contribution to ROD BLAGOJEVICH. On or about December 3, 2008, ROD BLAGOJEVICH indicated to Monk that he was concerned that Racetrack Executive would not make a contribution by the end of the year if he signed the Racing Bill before the contribution was made. As a result, Monk and ROD BLAGOJEVICH agreed that Monk would speak with Racetrack Executive to ensure that Racetrack Executive would make a contribution by the end of the year.

5.      It was further part of the conspiracy that after meeting with defendant ROD BLAGOJEVICH on or about December 3, 2008, Monk visited

Racetrack Executive. During that visit, Monk communicated to Racetrack Executive that ROD BLAGOJEVICH was concerned that Racetrack Executive would not make a contribution to ROD BLAGOJEVICH if the Racing Bill was signed before the contribution was made.

6. It was further part of the conspiracy that after meeting with Racetrack Executive on or about December 3, 2008, Monk reported to defendant ROD BLAGOJEVICH that Monk had said to Racetrack Executive, "look, there is a concern that there is going to be some skittishness if your bill gets signed because of the timeliness of the commitment," and made it clear to Racetrack Executive that the contribution has "got to be in now." ROD BLAGOJEVICH responded, "good," and "good job."

7. It was further part of the conspiracy that on or about December 4, 2008, Monk asked defendant ROD BLAGOJEVICH to call Racetrack Executive and to suggest that ROD BLAGOJEVICH would sign the Racing Bill, because this would be better "from a pressure point of view." ROD BLAGOJEVICH agreed to call Racetrack Executive.

8. It was further part of the conspiracy that defendant ROD BLAGOJEVICH and Monk did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT EIGHTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraph 1(a) of Count One is realleged and incorporated as though fully set forth herein.

2.    Beginning in or about October 2008 and continuing through December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH,

defendant herein, and others did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from Construction Executive (who was both an executive with a company that supplied materials for road construction, and a representative of a trade group involved with the construction of roads), and from the company that employed Construction Executive, with the consent of Construction Executive and his employer induced under the color of official right, and by the wrongful use of actual and threatened fear of economic harm;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT NINETEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraphs 1(a) and (b) of Count One are realleged and incorporated as though fully set forth herein.

2.    In 2005, the Federal Bureau of Investigation was investigating corruption and fraudulent conduct relating to the Office of the Governor of Illinois and related entities and individuals (the "Investigation"). As of March 16, 2005, the following matters, among others, were material to the Investigation:

   a.    Whether defendant ROD BLAGOJEVICH and his associates solicited business entities for campaign contributions for the benefit of ROD BLAGOJEVICH in exchange for obtaining or keeping state contracts and other business opportunities with State agencies, boards, and commissions;

   b.    Whether defendant ROD BLAGOJEVICH and his associates solicited individuals for campaign contributions for the benefit of ROD BLAGOJEVICH as a condition of obtaining state employment and appointments to state boards and commissions;

   c.    Whether defendant ROD BLAGOJEVICH and his associates required that campaign contributions for the benefit of ROD BLAGOJEVICH be in certain amounts in order for the contributors to obtain state employment,

appointments to state boards and commissions, state contracts, and other business opportunities with state entities;

        d.    Whether, after becoming Governor of Illinois, defendant ROD BLAGOJEVICH kept informed of the individuals and entities contributing to his political campaign and the amounts of the contributions.

        2.    On or about March 16, 2005, in Chicago, in the Northern District of Illinois, Eastern Division,

ROD BLAGOJEVICH,

defendant herein, did knowingly and willfully make materially false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the Government of the United States, when ROD BLAGOJEVICH, interviewed by agents of the Federal Bureau of Investigation in the presence of his counsel, stated in sum and substance that:

Since the time that he became governor,

    (i)    ROD BLAGOJEVICH maintains a separation or firewall between politics and state business; and

    (ii)    ROD BLAGOJEVICH does not track, or want to know, who contributes to him or how much they are contributing to him;

69

Whereas, in truth and in fact, as ROD BLAGOJEVICH then well knew, these statements were false;

In violation of Title 18, United States Code, Section 1001(a)(2).

## FORFEITURE ALLEGATION ONE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      The allegations contained in Count One are realleged and incorporated by reference for the purposes of alleging forfeiture pursuant to Title 18, United States Code, Section 1963.

2.      As a result of the violation of Title 18, United States Code, Section 1962(d), as alleged in the foregoing indictment,

ROD BLAGOJEVICH,

defendant herein:

a.      has acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

b.      has interests in, claims against, and property and contractual rights affording sources of influence over, the enterprise, described in Count One, which the defendant established, operated, controlled, conducted, and participated in the conduct of, and conspired to do so, in violation of Title 18, United States Code, Section 1962, thereby making all such interests, claims, and property and contractual rights subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 1963(a)(2); and

71

c.    has property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1963(a)(3).

3.    The interests of the defendant subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1) and (a)(2) include but are not limited to:

All funds, certificates of deposit, letters of credit and assets held by Ravenswood Bank, DuQuoin State Bank, First Suburban National Bank, and Community Bank of DuPage in the name of or on behalf of Friends of Blagojevich.

4.    The interests of the defendant subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3), include but are not limited to approximately $188,370.

5.    To the extent that the property and the proceeds described above as being subject to forfeiture pursuant to Title 18, United States Code, Section 1963, as a result of any acts or omission by the defendant:

cannot be located upon the exercise of due diligence;

have been transferred or sold to, or deposited with, a third party;

have been placed beyond the jurisdiction of the Court;

have been substantially diminished in value, or;

have been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to Title 18, United

States Code, Section 1963(m), to seek forfeiture of any other property of the

defendant up to the value of the proceeds and property described above as being

subject to forfeiture, including:

a.   Real property located at 1736 18th Street, NW, Apartment 303, Washington, DC, 20009-6105 and legally described as follows:

Lot 2075, Block 0133, Map 40 D
PIN: 0133 // 2075

b.   Real property located at 2934 Sunnyside Avenue, Chicago, Illinois, and legally described as follows:

LOT 24 AND THE SOUTH 20 FEET OF LOT 25 IN BLOCK 52 IN RAVENSWOOD MANOR, BEING A SUBDIVISON OF PART OF THE NORTH ½ OF SECTION 12, TOWNSHIP 40 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS
PIN: 13-13-121-031;

Pursuant to Title 18, United States Code, Section 1963.

## FORFEITURE ALLEGATION TWO

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     The allegations contained in Counts Two through Twelve are realleged and incorporated by reference for the purposes of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     As a result of the violations of Title 18, United States Code, Sections 1343 and 1346, as alleged in the foregoing indictment,

ROD BLAGOJEVICH,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section, 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all right, title and interest in property, real and personal, which constitutes and is derived from proceeds traceable to the charged offenses.

3.     The interests of the defendant subject to forfeiture pursuant to Title 18, United States Code, Section, 981(a)(1)(C) and Title 28, United States Code, Section 2461(c) include but are not limited to approximately $188,370.

4.     If any of the property subject to forfeiture and described above, as a result of any act or omission of the defendant:

Cannot be located upon the exercise of due diligence;

Has been transferred or sold to, or deposited with, a third party;

74

Has been placed beyond the jurisdiction of the Court;

Has been substantially diminished in value; or

Has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), including

a. Real property located at 1736 18th Street, NW, Apartment 303, Washington, District of Columbia, 20009-6105 and legally described as follows:

   Lot 2075, Block 0133, Map 40 D
   PIN: 0133 // 2075

b. Real property located at 2934 Sunnyside Avenue Chicago, Illinois, and legally described as follows:

   LOT 24 AND THE SOUTH 20 FEET OF LOT 25 IN BLOCK 52 IN RAVENSWOOD MANOR, BEING A SUBDIVISON OF PART OF THE NORTH ½ OF SECTION 12, TOWNSHIP 40 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS
   PIN: 13-13-121-031;

Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

_____

**FOREPERSON**

_____

**UNITED STATES ATTORNEY**